IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

SUSTAINABLE INVESTMENTS, LLC,    )
                                       )

        Plaintiff,          )    TC-MD 130313C

                                       )

      v.                  )

                                       )

MARION COUNTY ASSESSOR,    )

                                       )

        Defendant.      )    **FINAL DECISION**

The court entered its Decision in the above-entitled matter on November 14, 2013. The court did not receive a request for an award of costs and disbursements (TCR-MD 19) within 14 days after its Decision was entered. The court's Final Decision incorporates its Decision without change.

Plaintiff appeals the real market value of 127 lots identified as tax lots 1 through 146, exclusive of tax lots 18, 24, 29, 30, 37, 38, 43, 44, 51, 52, 54 to 57, 76, 77, 92, and 137 (subject property).[1] (Ptf's Compl at 2-4; Ptf's Am Compl at 2-5.) The lots under appeal are located in the Pringle Creek Community Subdivision in Salem, Oregon. The tax year at issue is 2012-13.

A trial was held in the Oregon Tax Court Mediation Center in Salem, Oregon, on November 18, 2013. Gordon R. Hanna, attorney at law, appeared on behalf of Plaintiff. Scott A. Norris, Assistant County Counsel, appeared on behalf of Defendant. Robb Witters, Senior Residential Appraiser, testified on behalf of Defendant. Plaintiff did not present any witnesses.

---

[1] The corresponding Assessor Accounts are R340975 through R340977 (tax lots 1-3), R341043 through R341056 (tax lots 4-17), R341058 through R341062 (tax lots 19–23), R340978 and R340979 (tax lots 25 and 26), R341064 and R341065 (tax lots 27 and 28), R340982 (tax lot 31), R341066 through R341070 (tax lots 32–36), R340984 (tax lot 39), R341072 through R341074 (tax lots 40-42), R341077 (tax lot 45), R341079 through R341083 (tax lots 46-50), R341086 (tax lot 53), R340988 through R340999 (tax lots 58-69), R341000 through R341005 (tax lots 70-75), R341008 through R341021 (tax lots 78-91), R341023 through R341035 (tax lots 93-105), R340941 through R340948 (tax lots 106-113), R341036 through R341042 (tax lots 114-120), R340949 through R340964 (tax lots 121-136), and R340966 through R340974 (tax lots 138-146). (Ptf's Compl at 2-4; Ptf's Am Compl at 2-6.)

Plaintiff's Exhibits 1 to 11 were received without objection. Defendant's Exhibit A was received without objection. Both parties' exhibits include appraisal reports.

Although some of the lots that comprise the subject property are developed, Plaintiff is only challenging the real market values of the land, requesting all lots be valued at $10 per square foot. (Ptf's Hearing Memo at 1.) Plaintiff is seeking a reduction in total real market value for the subject property from $9,969,720 to $3,814,770. (Ptf's Am Compl at 3, 8.) Defendant has asked the court to sustain the real market values found by the county board of property tax appeals (board) for all but three tax lots: lots 103, 122, and 128, and that the real market values of the on-site developments currently on the rolls for lots 39 and 40 be added to the board's real market value determinations for those two lots. (Def's Ans at 2-3; Def's Ex A-i.)

## I. STATEMENT OF FACTS

The subject property is part of an approximately 32 acre property, more than one third of which is dedicated to common areas and green spaces. (Def's Ex A-1; *cf.* Ptf's Ex 3 at 7.) All the lots at issue are single-family residential lots.[2]

/ / /

---

[2] The court determined that only single-family residential lots were at issue through analysis of the pleadings and evidence. The development is a mixture of residential and commercially zoned lots, and neither the Complaint nor Amended Complaint identify the zoning of the lots at issue. Plaintiff's Exhibit 3 is an appraisal report prepared by Katherine Powell Banz (Banz) dated April 24, 2012. That appraisal presents a valuation estimate for 128 residential lots, five single-family residences, and three commercial lots. (Ptf's Ex 3 at 1.) Plaintiff's Exhibit 4 is a valuation update prepared by Banz dated March 17, 2013, for Plaintiff's appeal to the board. It indicates that "the original appraisal included 128 completed residential lots," but that the new value estimate letter was an "amendment [that] focuses on the 127 single-family residential lots only." (Ptf's Ex 4 at 1.)

The report identifies the three commercial lots as lot numbers 29, 56, and 76. (*Id.* at 79.) While Banz's appraisal report does not specifically provide a lot or account number for the multi-family residential lot, it does indicate that the size of the lot is 56,628 square feet. (*Id.* at 76.) Plaintiff's original Complaint lists all 146 lots in the subdivision and the only lot listed as similar in size is lot 137, with an indicated size of 56,396 square feet. (Ptf's Compl at 4.) Plaintiff's original Complaint does not include value estimates for any of those four tax lots and the Amended Complaint does not list those accounts.

The subject property is part of a larger property previously owned by the state "which spent the majority of the last century in State of Oregon ownership as a home for the developmentally disabled under state care." (Ptf's Ex 3 at 6.) The site is described in Plaintiff's materials as the "Fairview" property, and was formerly operated as the Fairview Training Center. (*Id.*; Def's Ex A-47.)

> "In April 2002 the entire Fairview site was purchased with an option agreement by Sustainable Fairview Associates LLC, a consortium of investors intent on developing the property with sustainable building standards. The reported purchase price was $12,450,000, which included 277.17 acres of land with a private water system with City backup capacity and 57 buildings constructed between 1908 and 1970 [that are] in various states of repair. * * *.

> "* * * * *

> "* * * [T]he north 32.13 acres * * * were purchased by Sustainable Investments, LLC on November 22, 2004 for a recorded consideration of $2,500,000 * * *."

(Ptf's Ex 3 at 7.) This appeal concerns those 32.13 acres.

The parties agree that the subject property is unique, described by Plaintiff in its Hearing Memo to have been planned as "a model community with special sustainability features [that] include narrow, winding streets to encourage walking and biking, special building restrictions that promote sustainability, small lots and open spaces." (Ptf's Hearing Memo at 2.) "The site is zoned FMU (Fairview Mixed-Use) by the City of Salem. The purpose of the FMU zone is to implement the Salem Area Comprehensive Plan 'Mixed-Use' land use designation and to encourage innovative planning that results in more mixed-use development with protection of open spaces and natural features, energy conservation, architectural preservation, innovative integration of park and school uses, affordable housing options, and mixed-income neighborhoods." (Ptf's Ex 3 at 33.)

/ / /

The subject property is known as the "Pringle Creek Community."  (*See id*. at 29.)
Consistent with the FMU zoning,

> "Pringle Creek Community is a mixed-use project based on sustainable living principles.  The project was created with a vision of creating a 'village center' using some of the existing Fairview buildings for small community-oriented businesses and workshops; community gardens; and a wide variety of single and a multi-family living opportunities.
>
> "* * * * *
>
> "The * * * project includes a large amount of common area with trails and green space.  It is the intent of the developer that the smaller lot sizes will be offset by the availability of ample common area green space and other community amenities."

(*Id*.)

Among the common elements comprising the village center are two large rehabilitated greenhouses available for use by homeowners who build on the subject property, a painter's hall that "serves as a community meeting hall for Pringle Creek Community homeowners[,]" which, according to the developer "would possibly support community events, mailboxes, and other community-related amenities * * * [and which] serves as a meeting place for homeowners to mingle and interact with one another, promoting a 'community' atmosphere."  (Ptf's Ex 3 at 37-38.)  The property also includes a "pavilion" or "sawdust shed," the utility of which the parties dispute.  (*Compare* Def's Ex A-1 *with* Ptf's Ex 3 at 38.)  The property also has "a large outdoor garden on one half acre [of land] which * * * will be maintained and used by the community as well as supply produce for the Painters Hall Café[,]" and a root cellar "which has been converted for use as a community wine storage area, a place for parties, and wine tastings."  (Def's Ex A-2.)  There are also a carpentry building and walking paths.  (Ptf's Ex 3 at 50, 61.)  At least five single-family residential homes have been built in the Pringle Creek Community subdivision and a detached five-car garage has been constructed on a separate lot.  (*Id*. at 40.)

Defendant explains in its appraisal that "the neighborhood boasts more than 100 raingardens and bioswales * * * designed to hold excess water during heavy rainfall * * * [and] to naturally filter the water of pollutants and allow the water to * * * return * * * back to the aquifer." (Def's Ex A-2.) The streets in the subdivision are referred to as "greenstreets" and "are made to be porous [to] allow the water to filter through them back to the aquifer." (*Id*.) Also, "[t]he neighborhood boasts a ground-source heating and cooling system serving 77 home sites and commercial lots. Individual heat pumps are able to use this system for the heating and cooling of homes and businesses." (*Id*.)

The subject lots are almost all smaller than typical residential lots, ranging in size from a minimum of approximately 871 square feet to a maximum of approximately 10,890 square feet.[3] (Ptf's Ex 4 at 2, 6.) The vast majority of the lots – all but 15 – are 5,000 square feet or smaller, and only five of the lots are larger than 6,000 square feet. (*Id*. at 6.) The parties report that average lot size is approximately 3000 square feet. (Ptf's Ex 3 at 29; Def's Ex A-2.) According to the evidence, development is restricted to "small cottage-style single-family homes of 800 SF and above, larger single-family residences of 1,400 to 2,200 SF, rowhouses, townhouses, duplexes, and live-work units with offices or retail on the main floor and condominiums above." (Ptf's Ex 3 at 29.)

Plaintiff submitted 11 exhibits. Those exhibits include: a site plan; an "analysis" which is simply a multi-page table that identifies all of the lots under appeal, the county values and the values requested by Plaintiff; an appraisal report with the valuation effective April 24, 2012; a valuation update letter prepared by the same appraiser; the declaration of the principal of the

---

[3] Those are the reported lot sizes in Plaintiff's appraisal report. (Ptf's Ex 4 at 6.) Defendant reports slightly different sizes, indicating in its appraisal report that the minimum lot sizes 852 square feet in the maximum size is 10,876 square feet. (Def's Ex A-2.) The difference is not significant.

general contractor "in charge of the building and the development of Pringle Creek Community"; the "Declaration of Covenants, Conditions, and Restrictions for Pringle Creek Community"; the statutory bargain and sale deed for the purchase of the subject property and additional acreage by Sustainable Fairview Associates, LLC, in 2003; the warranty deed for the sale of the subject property to Plaintiff for $2,500,000 in 2004; a list of property sales; a collection of property summaries and photographs Plaintiff obtained from Defendant; and an exhibit submitted with its hearing memorandum that is a repackaging of the data in Plaintiff's Exhibit 2, the multi-page "analysis" mentioned above.

Plaintiff's appraisal report, Exhibit 3, provides a value estimate as of April 24, 2012. (Ptf's Ex 3.) That report indicates it was prepared by Katherine Powell Banz (Banz), MAI, Powell Valuation Inc.[4] (*Id*.) Banz did not testify at trial. That report provides a value estimate for the 127 lots that comprise the subject property, plus an additional residential lot, five single-family residences, three completed commercial lots, and various buildings. (*Cf. id*. at 1.) Banz reports that she considered the three standard approaches to valuation: cost, income, and sales comparison, but ultimately determined that the cost and income approaches were not applicable and relied solely on the sales comparison approach. (*Id*. at 2, 66-67.) Banz indicates in her report that the majority of the subject lots are smaller than all of the lots available in the Salem market, which typically "range from 5,000 to 8,000 square feet." (*Id*. at 68.) Banz evaluated five comparable sales and after making adjustments deemed appropriate, estimated the value of the subject lots based on four size categories as follows: lots between 871 square feet and 1,742 square feet had a "retail lot value" of $25,000; lots ranging in size from 2,178 square feet to 6,000 square feet had a value of $30,000; lots between 6,001 square feet and 10,000 square feet

---

[4] Although Banz did not testify, for ease of reference the court will refer to the author of the appraisal report as "Banz" because the report indicates it was written by her.

had a value of $35,000; and any lots greater than 10,000 square feet had a $40,000 value. (*Id*. at 73.) Banz states that the "aggregate retail lot value of the single-family residential lots, as of April 24, 2012 was[] $3,700,000 * * * [which] suggests an average single-family residential retail lot value of $29,134." (*Id*.)

Banz's April 24, 2012, value estimate also includes a "bulk sale value" estimate utilizing the discounted cash flow analysis method of valuation. (*Id*. at 89-91.) That approach led Banz to a bulk value estimate of $1,700,000 (rounded) based on a value of $12,977 per lot. (*Id*. at 91.) Banz indicates that the bulk sale values "include the contributory value of the Pringle Creek Community common areas and existing commercial improvements." (*Id*., Cover Let at 2.)

Banz indicates in her report that a property representative with whom she met identified 25 lots "as being non-developable due to archaeological issues," but states that upon additional investigation it was determined that the lots "are developable, once additional testing and mitigation is completed (per Bill Roulette, Applied Archaeological Research, Inc.)[.]" (*Id*.)

Banz reports that the lots were at one time listed for sale for prices "ranging from $68,000 to $325,000," with "[t]he upper end of the range reflect[ing] one lot that [wa]s planned for attached and/or multiple housing." (Ptf's Ex 3 at 7.) The appraiser indicates in her report that "[t]he lots do not appear to be actively listed for sale," and that a "listing history was found in the Willamette Multiple Listing Service database" which indicated that "[t]he majority of the subject lots were initially listed for sale in 2007" and that "[t]hree lots sold before the remaining lots were taken off the market (expired) in mid-2009." (*Id*.)

Plaintiff also submitted a valuation letter update prepared by Banz which "is [to be] considered an amendment to [her] April 24, 2012 appraisal." (Ptf's Ex 4 at 1.) That document indicates that it "focuses on the 127 single-family residential lots only." (*Id*.) The amendment

further indicates that it provides "an updated valuation date of January 1, 2012 for the purposes of testimony regarding a pending property tax appeal." (*Id.*) The amended valuation letter update relies on the sales comparison approach, and based on the sale of five comparable properties indicates "an adjusted [value] range of $21,751 to $47,000." (*Id.* at 4.) Banz reports that she then considered "location, lot size, access, availability of utilities, and amenities[,]" and determined that "buyers would prefer to purchase a larger lot in a traditional subdivision rather than buy a smaller subject lot that includes a higher concentration of common area amenities[,] and that, based on those factors, the subject properties had a "base lot value for the * * * smallest residential lots * * * [of] $25,000." (*Id.*) Banz then applied "four subjective size" base lot value increases of $5,000, a subjective $5,000 "territorial view[]" adjustment to certain lots, which modified her value estimate to a "range from $25,000 to $40,000, totaling $3,700,000 (averaging $29,134 per lot)." (*Id.* at 5.) Banz further factored in alleged archaeological restrictions encumbering 24 of the lots, for which she applied a negative $30,000 overall adjustment, which came to $1,200 per lot for the 24 lots, plus a "20% contingency per lot." (*Id.* at 5.) Banz concluded that "the 127 single-family lots have an aggregate value of $3,531,200," with "lot values rang[ing] from $18,800 to $40,000, averaging $27,805 per lot[.]" (*Id.*)

Defendant submitted an appraisal report prepared by Witters. Witters testified that he has been employed by the assessor for five years and been in his current position for the past four years. Witters acknowledged the small size of the lots, noting they had an average lot size of "slightly larger than 3,000 square feet with a median size of approximately 2,650 square feet." (Def's Ex A-2.) Witters "[c]ombin[ed] the common areas and green spaces with the residential lots" and concluded that space "would add approximately 3,800 square feet to each lot." (*Id.*) Witters concluded that the average effective residential lot size was 6,857 square feet, with the

minimum effective lot size being 4,658 square feet and the maximum being 14,682 square feet. (*Id.*)

Witters noted the FMU zoning designation with the sustainability features discussed above, as well as three additional overlay zones (low-intensity residential, mixed-intensity, and adaptive use) that govern the types of development allowed and impose density limitations. (Def's Ex A-2 and A-3.)

In valuing the subject property, Witters considered five comparable sales occurring between April and December 2011 for prices ranging from a low of $50,000 to a high of $130,000 for lots ranging in size from 6,237 square feet to 15,002 square feet. (*See id.* at A-4.) Witters made only one adjustment to his comparable sales, subtracting $30,000 from the sale price of his Comparable 1, which is the largest of his comparable lots (15,002 square feet), for that property's superior golf course view. (*Id.*) Witters used that comparable sale as the basis for his determination of the real market value of the larger of the subject lots. (*Id.* at A-5.) Witters determined that the smaller lots that are less than 2,000 square feet had a real market value of $45,000 on the applicable assessment date of January 1, 2012; that the lots in his next grouping, with areas greater than 1,999 square feet and less than 4,000 square feet, had a real market value of $55,000; and that the residential lots between 4,000 square feet and 7,000 square feet had a real market value of $65,000. (*Id.*) Based on those value estimates, Defendant has requested the current real market values on the assessment and tax rolls as found by the board be sustained except for five of the lots at issue (lots 39, 40, 103, 122, and 128). (*Id.* at A-i.)

Two of the lots under appeal are improved with residences, and, based on Witters' appraisal, Defendant is requesting that the land real market values of those lots be increased "to include the value of the onsite developments (OSD)." (*Id.* at A-5.) Witters estimated the value

of the OSDs based on average City of Salem system development charges, "as well as an additional amount for landscaping." (*Id.*) Witters did not include the data to support those adjustments, but indicates in his report that the land real market value for lot 39 (Account R340984) should be "increased" to $67,100 and the land real market value for lot 40 (Account R341072) should be "increased" to $67,500. (*Id.*) Both of those lots are in Witters' 4,000 square foot the 7,000 square foot lot size range and have a base real market value estimate (determined by Witters) of $55,000. (*Id.* at A-113.) The current land real market value on the assessment and tax rolls for lot 39 is $67,100. (Ptf's Compl at 68.) The current land real market value on the assessment and tax rolls for lot 40 is $67,500. (*Id.* at 69.)

As for the three larger lots for which Defendant seeks real market value increases (lots 103, 122, and 128, with corresponding Account numbers R341033, R340950, and R340956), Defendant is recommending that two of the lots, 103 and 128, which are slightly larger than 8,000 square feet, have their real market values increased to $85,000. (*Id.* at A-5.) Defendant further recommends that lot 122, which is 10,876 square feet, have its real market value increased to $115,000. (*Id.*) Defendant notes in its report that "[t]hese lots are the largest residential lots within the subdivision and would support multi dwelling attached units, as well as have much fewer limitations in regard to residential footprint/design and would demand a higher market value." (*Id.*) Defendant explains that the recommended value increases for those three lots "is evidenced by the original asking price differences compared to the rest of the lots in the subdivision, as well as the descriptions of the lots when they were listed on MLS as shown in the appendix." (*Id.*) Lots 103, 122 and 128 all have current real market values, as reduced by the board, of $65,000. (Ptf's Compl at 24, 30, 128.)

## II. ANALYSIS

In Oregon, all real property "not exempt from ad valorem property taxation or subject to special assessment shall be valued at 100 percent of its real market value." ORS 308.232.[5]

Real market value is defined in ORS 308.205(1) as follows:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an
>
> informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

Real market value is determined by the particular methods and procedures adopted by the Department of Revenue. ORS 308.205(2). There are three approaches to valuation (income, cost, and sales comparison) that must be considered when determining the real market value of a property, although they need not all be developed. OAR 150-308.205-(A)(2)(a) (all three approaches must be considered, although all three approaches may not be applicable to valuation of given property); *see also Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995); Appraisal Institute, *The Appraisal of Real Estate* 130 (13th ed 2008). When value is appealed to the court, the approach to be used (or combination of approaches) "is a question of fact to be determined by the court upon the record." *Pacific Power & Light Co. v. Dept. of Revenue*, 286 Or 529, 533, 596 P2d 912 (1979).

As the party seeking affirmative relief, Plaintiff bears the burden of proving that the subject property's real market value on the assessment and tax rolls is incorrect. *See* ORS 305.427. Plaintiff must "establish [its] claim[] by a preponderance of the evidence, or the more convincing or greater weight of evidence." *Schaefer v. Dept. of Rev.*, TC No 4530, WL 914208 at *2 (Jul 12, 2001) (citing *Feves v. Dept. of Revenue*, 4 OTR 302 (1971)).

Burden of proof requires that the party seeking relief, Plaintiff in this case, provide

---

[5] The court's references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2011.

evidence to support its argument. The evidence that a plaintiff provides must be *competent* evidence of the requested real market value of the property in order to sustain the burden of proof. *Poddar v. Dept. of Rev*., 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)).

"Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD No 110300D, WL 879285 (Mar 13, 2012). Evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990).

"The value of a given property is ultimately a question of fact[.]" *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001) (citation omitted). Finally, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

Looking first at Plaintiff's evidence, the court cannot grant Plaintiff's value reduction requests because the appraisal reports and other information submitted by Plaintiff were unsupported by expert testimony, and the appraisal report, standing alone, is not persuasive of the flat $10 per square foot value Plaintiff seeks for all the residential lots under appeal. Plaintiff's representative Hanna did make some persuasive points about problems affecting the subject property. The property does appear to be a developer's unrealized dream, tied to the exacting sustainability standards required within the subdivision, which increased the costs of construction on lots that are unusually small for the Salem area. However, Plaintiff's own appraiser acknowledged in her report that the additional open and green spaces were designed

and intended to enhance the appeal of the lots, giving the prospective buyer ample space to enjoy beyond the boundaries of a given lot. Amenities include walking trails, a wine cellar, a half-acre community garden, two greenhouses, historic buildings, a painter's hall with many appealing features, a protected creek that meanders through the property, multiple rain gardens, and access to geothermal heating. While it is true that few of the lots sold, Plaintiff did not dispute Defendant's claim that the subject property has not been marketed for four or five years. Without the sworn testimony of Plaintiff's appraiser Banz, the court is simply not persuaded by the evidence. It is difficult in any case to prevail in a request for a real market value reduction of a property based on the submission of an appraisal report without the supporting testimony of the author of that report.

As for Defendant's requested value increases, the evidence simply does not support the values presented. Defendant seeks an increase in the value of three of the subject tax lots based on one comparable sale that is only adjusted for a superior view. That property is in a completely different part of town, in an established neighborhood, and, standing alone, is insufficient to establish by a preponderance of the evidence that lots 103, 122, and 128 should have their real market values increased. The court is confused by Defendant's request for land value "increases" on lots 39 and 40, as the requested land real market values match those currently on the rolls.

### III. CONCLUSION

The court has evaluated the evidence and concludes the real market values currently on the assessment and tax rolls for the 127 tax lots appealed should be sustained. Now, therefore,

/ / /

/ / /

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

IT IS FURTHER DECIDED that Defendant's counterclaims are denied.

Dated this ____ day of February 2014.


_____
DAN ROBINSON
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Final Decision or this Final Decision cannot be changed.*

*This document was signed by Magistrate Dan Robinson on February 18, 2014. The court filed and entered this document on February 18, 2014.*